## UNITED STATES v. INSURANCE CO. OF NORTH AMERICA.

### Clv. A. No. 475.

District Court, W. D. South Carolina, Spartanburg Division.

April 29, 1946.

Oscar H. Doyle, U. S. Atty., of Greenville, S. C., Claude T. Coffman, Office of Solicitor, Department of Agriculture, of Washington, D. C., and John M. Wolfe, Office of Atty. Gen., of Washington, D. C., for United States.

Stephen Nettles, of Greenville, S. C., for defendant.

WYCHE, District Judge.

This is an action by the United States against the Insurance Company of North America to recover the value of 518 bales of cotton, which were destroyed by fire on August 19, 1942, while stored in a warehouse belonging to Carolina Warehouse Company, near Spartanburg, South Carolina. The cotton had been stored in the warehouse under the terms of an agreement between Commodity Credit Corporation, an agency and instrumentality of the government, and the Carolina Warehouse Company.

The complaint alleges that plaintiff, acting through its agency, Commodity Credit Corporation, hereinafter called Commodity, entered into a contract of storage with Carolina Warehouse Company, hereinafter called Carolina, under which the warehouse company agreed to store cotton owned by the plaintiff and to insure and keep insured against loss or ·damage by fire, so long as its receipts for same were outstanding, all cotton subject to the agreement; that pursuant to such agreement Carolina insured such cotton of the plaintiff with the defendant insurance company; that the

said cotton was destroyed by fire on August 19, 1942; that at the time of the loss, the said policy of insurance was in full force and effect; and that demand was made upon the defendant for payment of the loss and such demand was refused.

The defendant, by its answer, admits that plaintiff's cotton was lost by fire on the date alleged, while it was on storage with Carolina, and that at that time Carolina held the defendant's insurance policy No. 57318, reference to which is made for the coverage and terms thereof. Further answering, the defendant alleges that prior to the fire, the cotton storage contract, referred to in the complaint, was terminated by mutual consent of the parties thereto, and a new storage contract was entered into by them under the terms of which Carolina was not obligated to insure plaintiff's cotton against loss by fire, and that the liability for loss was agreed to rest upon plaintiff, and not upon Carolina, or its insurer, and that, consequently, the defendant is not liable to plaintiff for the loss.

The facts, practically undisputed, are substantially as follows: On October 10, 1939, Commodity and Carolina entered into a written contract for the storage of Commodity's cotton, referred to as "acquired cotton", by the terms of which, Carolina was obligated to insure and keep insured such cotton against loss and damage by fire.

On April 8, 1942, in compliance with the terms of the contract of October 10, 1939, Carolina purchased a policy of insurance from the defendant, in which defendant insured cotton against loss or damage by fire while in the legal custody of Carolina, and for which insured receipts had been issued by Carolina, and which were outstanding and effective prior to loss, and this policy of insurance was in full force on August 19, 1942, and provided that "premium shall be computed and paid monthly * * * where the cotton has been at risk and on the average value at risk during the month, such average value to be determined by taking the value at risk at the close of each day."

On August 19, 1942, Commodity was the owner of 518 bales of cotton stored with Carolina, and for which Carolina had, prior thereto, issued its negotiable insured receipts, which were owned and held by Commodity on such date; these 518 bales of cotton were destroyed by fire on August 19, 1942, while so stored by Carolina, and the value thereof was $41,035.28.

On January 7, 1942, Commodity sent two unsigned forms of a proposed new contract of storage to Carolina. This form of contract provided, in substance, insofar as insurance was concerned, that Carolina would not be obligated to carry insurance, and that Commodity would save Carolina harmless for loss which would have been covered by a certain form of insurance policy if such policy had been effected. This form of contract was to become effective as of February 1, 1942.

Commodity sent with the forms of the proposed new storage contract a letter of explanation and instructions, and instructed Carolina not to cancel its insurance on Commodity's cotton until February 1, 1942, and then only after it had received its completed copy of the new contract. Carolina, by letter to Commodity, declined to enter into the proposed new contract, because the receipt of two years' storage charges in one year, as provided by the proposed contract, would cause Carolina's income tax to be assessed at a higher rate.

On July 8, 1942, Carolina, by letter to Commodity, stated that its fiscal year had ended, and it had decided to enter into the proposed new contract, and on July 27, 1942, signed the proposed new contract, to be effective as of February 1, 1942, and sent it to Commodity for completion and return to it of its copy.

On July 30, 1942, Commodity wrote to Carolina stating that it would not sign the contract to be effective as of February 1, 1942, and then sent to Carolina two forms of the proposed new contract to be effective August 1, 1942. These forms were identical with those sent on January 7, 1942, except that the effective date was August 1, 1942, instead of February 1, 1942.

On August 4, 1942, Carolina, by its treasurer, W. S. Glenn, at Spartanburg, South Carolina, signed the two forms, purportedly effective as of August 1, 1942, and mailed

them to Commodity at New Orleans, Louisiana.

On or about August 4, 1942, and prior to August 19, 1942, W. S. Glenn, by telephone, told Ward and Covington, defendant's agents at Spartanburg, South Carolina, that he had signed a new contract of storage with Commodity, but had not received his company's completed copy, and that when he did receive it, he would relieve them of the coverage of Commodity's cotton.

On August 10, 1942, Commodity, by its Regional Director, F. P. Biggs, at New Orleans, Louisiana, signed the two forms of the new storage contract, and a subordinate employee dictated a letter in the name of Biggs, under date of August 10, 1942, addressed to Carolina, stating that the new agreement had been completed, and Carolina's copy, together with a tag-list of the subject cotton, were enclosed.

The letter dated August 10, 1942, from Commodity to Carolina was received at Spartanburg, South Carolina, August 27, 1942. There being no explanation for the delay, I conclude that the letter and enclosures were not deposited in the mail by Commodity until after August 19, 1942.

After refusing on demand to pay Commodity for the loss of its cotton, the defendant on October 23, 1942, attached to its policy of insurance a printed form of indorsement designated as "Special Cotton Endorsement No. 9-X", by which it purportedly excluded as of August 1, 1942, Commodity's cotton from the coverage of its policy. The said endorsement is as follows:

"(January, 1942)

"SPECIAL COTTON ENDORSEMENT NO. 9-X.

"(For Attachment to Form 16-A- Excluding From Coverage 'Acquired Cotton' (Only) of the Commodity Credit Corporation.)

"1. Subject to all the terms and conditions of this policy, it is understood and agreed that, effective as of this date, this insurance does not attach to or cover on any acquired cotton now or hereafter in the insured's custody.

"2. The term 'acquired cotton' as referred to herein shall mean all cotton in bales stored with the warehouse company, the legal title to which is held by the Commodity Credit Corporation, including such cotton as may have been pooled for the account of the producers and held by the Commodity Credit Corporation after January 31, 1942.

"3. In the event that title to acquired cotton under insured warehouse receipts of the insured shall pass from the Commodity Credit Corporation to others, then this endorsement shall cease to exclude such cotton and the same will then be covered for the benefit of such subsequent owners for its full market value under the terms of the policy to which this endorsement is attached.

"4. Effective from the date of this endorsement, and solely for the purpose of assessing premiums under this policy, the insured agrees to secure from the Commodity Credit Corporation information (including identification) showing:

"(a) The number of bales of acquired cotton already in his custody on the date this endorsement becomes effective. All such cotton shall be reported as ceasing to be a risk under this policy on such date;

"(b) The dates on which any cotton, already in the insured's custody, is subsequently acquired by the Commodity Credit Corporation. All such cotton shall be reported as ceasing to be at risk under this policy as of such dates;

"(c) The number of bales of acquired cotton sold or transferred by the Commodity Credit Corporation to others. All such cotton shall be reported as soon as practicable as coming at risk under this policy as of the dates on which the warehouse receipts representing the cotton are transferred to the successors in title thereto.

"All other terms and conditions remain unchanged.

"This endorsement is attached to and forms a part of Policy No. 57318 of the In-

404

surance Company of North America of Philadelphia, Pa.

"Issued at its Spartanburg, S. C. Agency.

"Dated 10–23–42 Effective 8–1–42

"Ward & Covington Agent
"By: K. S. Covington

"The above has been carefully read and its conditions are assented to.

"Carolina Warehouse Co. Inc.
Insured.
"By W. S. Glenn Treas."

After the fire and an exchange of correspondence between Commodity and defendant claiming and denying liability, respectively, Commodity paid Carolina storage charges in accordance with the provisions of the new contract for storage after August 1, 1942.

The question to be determined in this controversy is: Was plaintiff's cotton within the coverage of the insurance policy on the date it was destroyed by fire?

The defendant contends that, by the terms of paragraphs 6 and 11 of the new storage agreement, Commodity's cotton was automatically released from the coverage of the insurance policy. The coverage under the insurance policy is as follows: "Coverage–1. (a) This insurance covers the risk of loss or damage by fire to cotton in bales in the legal custody of the Insured, but only to cotton for which insured receipts have been issued, prior to loss, and are outstanding and effective during the life of this policy, and only while such cotton (and not to include cotton linters or hull fibers) is contained in any of the buildings, sheds, platforms and/or yards on the hereinafter described premises of the Insured * * *."

Paragraph 6 of the new storage agreement is as follows:

"6. The Warehouseman shall not be obligated to insure acquired cotton against loss or damage from fire, and, in the event of such loss or damage, Commodity shall save the Warehouseman harmless from any liability which, if the Warehouseman had insured such cotton against loss or damage from fire under the insurance form approved by the South Eastern Underwriters Association and designated as 'Compress and/or Warehouse Liability under Insured Receipts, Standard Form 16–A, as Revised July 23, 1940, insurance policy,' would have been within the coverage of such policy. If warehouse receipts representing acquired cotton are transferred to a person other than the Warehouseman, Commodity's undertaking, as set out above, to save the Warehouseman harmless from liability for loss or damage to acquired cotton from fire shall be effective only with respect to liability arising prior to the date of transfer as reported to the Warehouseman by Commodity in accordance with paragraph 5 of this Agreement."

Paragraph 11 is as follows: "11. This Agreement shall supersede any existing agreement between the Warehouseman and Commodity, and the terms of this Agreement shall prevail over the written or printed terms of warehouse receipts representing acquired cotton, except that this shall not be construed as a waiver of the Warehouseman's disclaimer of liability for loss or damage resulting from strikes, riots, public enemy, and acts of God."

At the time of the loss by fire the insurance policy was still in force and effect, and, in my opinion, it makes no difference which storage agreement was in effect. Under the original agreement between Commodity and Carolina, and under the terms of the insurance policy, the cotton was within the coverage of the insurance policy, and remained so, unless something was done which removed it therefrom. Paragraph 6 of the new storage agreement provides that Carolina shall not be obligated to insure Commodity's acquired cotton against loss or damage by fire, and that in the event of loss, Commodity would save Carolina harmless from any liability, which, if it had insured such cotton against loss by fire, would have been within the coverage of the policy. There is nothing in this provision which can be construed to prevent Carolina from continuing in force the insurance it already had, as long as it desired, or for any reason it might deem of importance to it, whether such reasons were well founded or not.

Paragraph 11 provides that the agreement shall supersede any existing agreement between the parties, and that its terms shall prevail over the written or printed terms of warehouse receipts representing acquired cotton, but there is nothing in this provision which either forbids the continuance of the insurance, or which declares that if it is continued, Commodity will disclaim all benefits arising under it.

What the two provisions mean is, that if Carolina exercises its right to take the subject cotton from the coverage of the insurance policy, Commodity will, in the event of loss, not claim that its property is insured, notwithstanding the fact that receipts held by it, representing its property, stipulate that its cotton is insured.

Nothing in the new contract indicates that the parties intended that either of them should forego any legal rights, such as, that Carolina could carry insurance if it so desired, or to indicate, that Commodity would be deprived of the right of any bailor of goods for storage to claim the benefits of insurance carried by the bailee, or the right of any party for whose benefit a contract is made, to maintain an action thereon. Except for its agreement to do so, Carolina was not obligated to Commodity to insure its cotton against loss by fire in the first instance, but it nevertheless could have done so, and if it had, the insurance would have inured to the benefit of Commodity. So that the most the new agreement could do, insofar as insurance is concerned, was to place Commodity and Carolina in exactly the same position they would have been in had there never been a contract requiring insurance to be taken.

The new agreement recognizes the existence of the insurance, and it contemplates that there shall be some further affirmative act on the part of the insured in order to effect the removal of any of the insured property from coverage. Both Mr. Glenn, Treasurer of Carolina, and the insurance company, acted upon that assumption. When Mr. Glenn signed copies of the contract on August 4, 1942, he was in an ambiguous situation. He had sent both copies to Commodity to be signed, and he did not know when it would do so, or whether it would ever do so, and he was not certain what his legal rights were. He cannot be blamed for this, for one of the contested questions in this case is: When did the new agreement become effective? He, therefore, called Ward and Covington, agents of the defendants, on the telephone, and told them that he had signed the agreement and that as soon as his company's completed copy had been returned, he would remove certain cotton from the coverage of the policy of insurance. He testified that he did not remember the details of his conversation with them, but that it was to this effect, and that he did not intend to take any chances about it. He was guarding against the very contingency that subsequently arose. He did not wish any question to be raised as to whether or not he had fulfilled the obligations of his company's contract with Commodity. What he did, therefore, amounted to his telling the agents of the defendant that he would, at some future date, take steps to remove the cotton from coverage, and he was making sure that this would not be done until he notified them further. He had a right to do this. Carolina thereby became bound to pay the premium on the risk until Carolina notified the agents of the defendant to discontinue the coverage. The policy of insurance provided that the premium should be computed and paid monthly; therefore, the premium for the month of August, 1942, or for any part thereof, was not assessable or collectible before September 1, 1942. Carolina was liable for the payment of premium on the insurance of Commodity's cotton up to and including the date of the fire, and consequently, the defendant is liable for the loss sustained thereby. The fact that the premium was not assessed and collected against Carolina beyond August 1, 1942, is because, long after the fire, the defendant decided that it was not liable for the loss, and on the basis of that conclusion, the premium was assessed and collected as of August 1, 1942. Had the loss not occurred, the defendant could, and would, have charged the amount of premium that would have been earned

up to the date of notice by Carolina of cancellation of the coverage.

The new storage agreement was not self-executing so as to remove the subject cotton from the coverage of the insurance. It did not by its terms cancel the insurance coverage. It required a further affirmative act to effect this result. The defendant insurance company, although not a party to the agreement, knew about such proposed agreements and prepared its Special Cotton Endorsement 9–X to assist the parties in carrying out their agreements. It will be noted that this form of endorsement was prepared in the month of January, 1942, when Commodity was preposing the new storage agreement to warehousemen throughout the cotton belt. Mr. Biggs testified there were about 2,000 or more such warehouses, and it was supposed that warehousemen in general would have executed the new agreement prior to February 1, 1942. The preparation of this endorsement to enable warehousemen to comply with the new agreement was put in language which evidences the defendant insurance company's understanding of what the agreement was, and it will be noted that the endorsement does not provide that it is effective as of the date the insured entered into a new agreement, but that it is *"effective as of this date,"* that is, the date of the endorsement. And, again it provides: "Effective from the date of this endorsement, and solely for the purpose of assessing premiums under this policy * * *", etc. The defendant insurance company, therefore, understood that the agreement was not self-executing to remove cotton from coverage, but that its risk would continue until the date of the execution of the endorsement, and it was careful to provide that it would assess premiums until that date. The endorsement further provides that cotton already in the custody of the insured on the date the endorsement becomes effective, which date had already been fixed as the *date of the endorsement,* shall be reported as ceasing to be a risk under the policy on such date.

Carolina issued two kinds of negotiable receipts for cotton held by it on storage. It issued a non-insured receipt and an insured receipt. Presumably the insurance company would have been just as willing and anxious to get the business on one type as on the other. There is no contention that what was done by virtue of the new agreement in any way increased the risk of loss to the cotton or had any causal connection with the fire, or that a higher premium would have been charged by defendant, or that the cotton destroyed could not be just as exactly and easily identified as before the new agreement. Therefore, the provision of the coverage clause, that only cotton for which insured receipts had been issued, and were outstanding and effective, was within the coverage, was in order only for the purpose of distinguishing it from the non-insured receipt cotton, so that the number of bales covered could be definitely determined and the earned premium calculated, and this could be done with the same certainty and exactness as before the proposed new agreement. It did not impose any liability upon the defendant that it had not already assumed, and it did not purport to confer any benefits on the defendant. The questions which the defendant raises in its defense are more nearly appropriate to the defense Carolina might have claimed if it had been sued for failure to perform the obligations of its contract.

■ It is well settled that if a warehouseman carries insurance on goods stored with him, the insurance company will be liable for the loss, notwithstanding that, under the storage agreement between the warehouseman and the depositor, the warehouseman is not obligated to the depositor to carry insurance. Section 239 of the Article on Bailments, 6 American Jurisprudence; Fire Insurance Association v. Merchants & Miners Transportation Co., 66 Md. 339, 7 A. 905, 59 Am.Rep 162; Boyd v. McKee, 99 Va. 72, 37 S.E. 810; Home Ins. Co. v. Baltimore Warehouse Co., 93 U.S. 527, 23 L.Ed. 868; California Ins. Co. v. Union Compress Co., 133 U.S. 387, 10 S.Ct. 365, 33 L.Ed. 730; Edwards v. Cleveland Mill & Power Co., 193 N.C. 780, 138 S.E. 131, 53 A.L.R. 1404.

It is also well settled that one for whose benefit a contract is made may maintain an action on it. Duncan v. Moon, Dud. S.C. 332; Thomas v. Atkinson, 94 S.C. 125, 77 S.E. 722.

Certain letters were offered in evidence by the defendant which passed between Carolina and Commodity, the Adjuster for Commodity and the Adjuster for the defendant, which were written after the date of the fire. They are not competent as they could not affect the rights of the parties which became fixed on the date of the fire.

Defendant argues that the action of W. R. Windes, an agent of the Department of Agriculture for administering the Federal Warehouse Act, 7 U.S.C.A. § 241 et seq., in approving the form of endorsement 9–X, attached to the policy of insurance, is competent to show that plaintiff, in some way, waived its right to claim the endorsement was not effective as of August 1, 1942. His action could not release any rights or claims of the United States. "Power to release or otherwise dispose of the rights and property of the United States is lodged in the Congress by the Constitution. Art. IV, § 3, Cl. 2. Subordinate officers of the United States are without that power, save only as it has been conferred upon them by Act of Congress or is to be implied from other powers so granted." Royal Indemnity Co. v. United States, 313 U.S. 289, 294, 61 S.Ct. 995, 997, 85 L.Ed. 1361.

For the foregoing reasons, I must conclude that:

1. The plaintiff's cotton was within the coverage of the insurance policy which was in force on August 19, 1942.

2. Defendant is liable to plaintiff for the value of its cotton which was lost by fire on August 19, 1942.

3. The defendant is entitled to a credit of the amount of the earned premium on the insurance on the cotton from August 1, 1942, until August 19, 1942.

The entry of appropriate judgment will be accordingly directed by proper order.